UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Melanie London

    *Plaintiff,*

    v.

Integra Financial Services, LLC,
Nevada Impact Management, LLC,
Skytrail Servicing Group LLC,
Mint Servicing, Inc.,
Creditserve, Inc.,
MoneyLion, Inc.,
LDF Holdings, LLC and
Chex Systems, Inc.

    *Defendants.*

Case Number:

Ad Damnum: **$18,000 + Atty Fees & Costs**

**JURY TRIAL DEMANDED**

## COMPLAINT & JURY TRIAL DEMAND

COMES NOW the Plaintiff, **Melanie London** ("**Ms. London**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Integra Financial Services, LLC** ("**Integra**"), **Nevada Impact Management, LLC** ("**Nevada Impact**"), **Skytrail Servicing Group LLC** ("**STS**"), **Mint Servicing, Inc. ("Mint"), Creditserve, Inc**. ("**Creditserve**"), **MoneyLion, Inc.** ("**MoneyLion**"), **LDF Holdings, LLC** ("**LDF Holdings**") and **Chex Systems, Inc.** ("**Chex Systems**"), (jointly, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.    This is an action brought by Ms. London against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

3.      The Defendants are subject to the provisions of the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the acts complained of were committed and / or caused by the Defendants therein.

## PARTIES

### Ms. London

5.      **Ms. London** is a natural person residing in Brandon, Hillsborough County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c).

### Integra / Nevada Impact

6.      **Integra** is a Nevada limited liability company, with a primary business address of **1759 N 400 East, Suite 202, North Logan, UT 84341**.

7.      Integra is not licensed to conduct business in the state of Florida.

8.      Integra's Nevada registered is **Clifton Keith Rooker, Esq., 2520 St. Rose Parkway, Suite 111, Henderson, NV 89074.**

9.      **Nevada Impact** is a Nevada limited liability company, with a primary business address of **2520 St Rose Parkway, Suite 111, Henderson, NV 89074.**

10.     Nevada Impact is not licensed to conduct business in the state of Florida.

11.    The Nevada registered agent for Nevada Impact is **Clifton Keith Rooker, Esq., 2520 St. Rose Parkway, Suite 111, Henderson, NV 89074**.

## STS

12.    **STS** is a Texas limited liability company that conducts online lending via its website, www.skytrailcash.com.

13.    Despite lending to consumers in Florida, STS has not registered with the Florida Office of Financial Regulation as a foreign company transacting business in Florida and, on information and belief, holds no Florida licenses.

14.    STS' main business address is **5904 Summerfield Dr., Texarkana, TX 75503**.

15.    STS' Texas registered agent is **Incorp Services, Inc., 815 Brazos St., Suite 500, Austin, TX 78701**.

## Mint

16.    **Mint** is a Delaware corporation with a primary business address of 7**925 Jones Branch Drive, Suite 3125, Tysons, VA 22102**.

17.    The Delaware registered agent for Mint is **Harvard Business Services, Inc., 16192 Costal Highway, Lewes, DE 19958**.

## Creditserve

18.    **Creditserve** is a California corporation with a primary business address reported as **137 N. Larchmont Blvd., Suite 705, Los Angeles, CA 90004**.

19.    Creditserve's registered agent is Christopher Chatham, **3109 W. Temple St., Los Angeles, CA 90026**.

## MoneyLion

20.    **MoneyLion** is a Delaware corporation with a primary business address of **30 West 21st St., 9th Floor, New York, NY 10010.**

21.    The Delaware registered agent for MoneyLion is **National Registered Agents, Inc., 1209 Orange Street, Wilmington, DE 19801.**

22.    MoneyLion does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

23.    MoneyLion also owns and controls **QuantiLion Data Strategies LLC** ("**QuantiLion**") which operates under the management and control of MoneyLion.

**LDF Holdings**

24.    **LDF Holdings** claims to be a wholly-owned subsidiary of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "**LDF Tribe**").

25.    The LDF Tribe claims that LDF Holdings operates from the second floor of a cigarette store called the Smoke Shop, located at **597 Peace Pipe Road, Lac du Flambeau, WI 54538. SEE PLAINTIFF'S EXHIBIT A.**

26.    The president of LDF Holdings is **Jessi Lee Phillips Lorenzo**, f/k/a Jessi Lee Phillips ("**Lorenzo**"). According to her LinkedIn profile, as well as information posted on LDF Holdings' website, Lorenzo is the president of LDF Holdings despite not being a member of the LDF Tribe. **SEE PLAINTIFF'S EXHIBITS B AND C.**

27.    Lorenzo resides at **502 S. Fremont Ave., Apartment 1107, Tampa, FL 33606.**

**Chex Systems**

28.    **Chex Systems** is a Minnesota corporation with a primary business address of **601 Riverside Ave., Jacksonville, FL 32204.**

29.    Chex Systems is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

30.    Chex Systems is a nationwide *Consumer Credit Reporting Agency* ("**CRA**") within the meaning of 15 U.S.C. § 1681a(f), in that, for monetary fees, dues, or on a cooperative nonprofit basis, it regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS

### Usurious Loans Prohibited in Florida

31.    The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

32.    Section 687.071, Florida Statutes renders the issuing of a loan with annual interest rates **greater than 45%** a felony.

33.    Section 687.071(7), Florida Statutes renders any such usurious loan unenforceable in Florida, sating "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

34.     Florida's usury statutes "protect against the oppression of debtors through excessive rates of interest charged by lenders." *Sheehy v. Franchise Tax Bd.*, 84 Cal.App.4th 280, 283, 100 Cal. Rptr. 2d 760 (2000). Any person who willfully makes such a loan, in addition to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).


## Sovereign Immunity as a Defense to State Usury Laws

35.     In an attempt to prevent prosecution under usury laws of states like Florida, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as *Rent-A-Tribe* schemes.

36.     In such schemes, non-tribal payday lenders create an often-elaborate charade that their non-tribal business is really "owned" and "operated" by a Native American tribe.  The illegal payday loans are then made name of a Native American tribal business entity which purports to be shielded from state and federal law via tribal sovereign immunity.  Of course, the tribal lending entity is usual a mere "front" for an illegal lending scheme; all substantive aspects of the payday lending operation are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for "renting" its sovereign immunity to the individuals and entities running the illegal payday lending business, the Native American tribe receives a fraction of the revenues generated, almost always in the range of 1% to 3% of revenues generated.

37.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

38.     To determine if a particular entity is entitled to sovereign immunity, the majority

of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities']

method of creation; (2) their purpose; (3) their structure, ownership, and management, including

the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities

to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities;

and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the

entities." *Breakthrough* at 1183, 1187-88.

39.     These so-called "tribal lenders" usually do not survive scrutiny when examined

closely, as the operations of the lender are conducted off tribal land, by non-tribal members, and

overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively

nil.

40.     Sovereign immunity, even if correctly invoked, does not turn an otherwise illegal

loan into a legal one. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding

criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme;

sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would

know that collecting unlawful debt is unlawful").

41.     While there have been some high-profile criminal prosecutions of non-tribal

lenders engaging in "rent-a-tribe" schemes (such as Scott Tucker, who was sentenced in 2018 to

16 years in a federal correctional facility for engaging in one of the largest documented "rent-a-

tribe" schemes), those making mere millions instead of hundreds of millions often go unperturbed.

### Origins of LDF Holdings and Tribal Payday Loan Operations

42.     In 2008, the LDF Tribe issued $50 million in bonds and entered into a Trust

Indenture to refinance and consolidate debts associated with the Lake of the Torches Casino

Facility, and to build a riverboat casino, hotel and Bed & Breakfast. *Wells Fargo Bank N.A. v. Lake of the Torches Econ. Dev. Corp.* 677 F. Supp. 1056, 1057 (E.D. Wis. 2010).

43.    The project was "plagued with problems since it began" and never generated the income needed to pay the bonds. Instead, the LDF Tribe was not only unable to make the bond payments but "was forced to reduce and eliminate many programs that [were] important to the health and welfare of the tribal members." *Id.* at 1057-1058.

44.    The LDF Tribe attempted to restructure the bonds in 2009 but was unsuccessful.

45.    The LDF Tribe stopped making payments on the bond in 2009, alleging that its contract with its lender effectively created a management contract in violation of the Indian Gaming Regulation Act. *Id.* at 1059.

46.    In 2013, facing dire economic circumstances, the LDF Tribe looked for other ways to shore up its finances.

47.    In May 2013, the LDF Tribe set about establishing an internet lending operation which would offer short-term, high-interest-rate loans to consumers via the internet. **SEE PLAINTIFF'S EXHIBIT B.**

48.    However, given the LDF Tribe's poor economic situation and credit history, it was unable to obtain credit from traditional sources to fund its new payday lending operations.

49.    As of May 2013, the LDF Tribe had neither experience in payday lending, nor knowledge of how to underwrite, collect, or service payday loans.

50.    An article published in the Tribe's newsletter, *Inwewin*, in July 2013 noted that the LDF Tribe had embarked on a **new** internet lending business. **SEE PLAINTIFF'S EXHIBIT C.**

51.    The July 2013 article stated that "the [LDF Tribe] has partnered with one of the largest and most experienced lending companies." *Id.*

52.    In fact, the LDF Tribe entered into agreements with several non-tribal owners of internet lending companies, including, without limitation, CreditServe and MoneyLion.

53.    For each of these agreements, the LDF Tribe, through its wholly owned subsidiary LDF Holdings, created an LLC, the operations of which were then turned over to its investors.

54.    In no case did the LDF Tribe actually manage, control, or operate the internet lending LLCs.

55.    Indeed, non-tribal individuals and entities control and manage all substantive lending functions, provide the lending capital necessary to support the operation and bear the economic risk associated with the operation of these LLCs.

56.    Because the LDF Tribe, through LDF Holdings, initially created the LLCs, these companies appeared to be owned by the LDF Tribe and were thus ostensibly privileged with sovereign immunity from various State and Federal lending laws that limit interest rates.

57.    In exchange for the use of the LDF Tribe as a purported shield from US law, the investors in these LLCs agreed to pay the Tribe a small percentage (often less than 3%) of each loan they made to a consumer.

58.    The LDF Tribe, in essence, rented out its name, allowing others to conduct business under it.

59.    Brent McFarland, the LDF Tribe's director of business development, told the Milwaukee Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1-237906421.html.

60.    Agreements under which a non-tribal company attempts to circumvent state and federal laws which would otherwise prohibit usurious loans, by licensing the tribe's name / identity, are commonly referred to as "Rent-A-Tribe" schemes.

61.    The LDF Tribe's internet lending operations were intended to lend money to consumers at astronomically high interest rates.

62.    Even the Tribe's July 2013 Inwewin article acknowledged that "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." **SEE PLAINTIFF'S EXHIBIT D.**

### LDF Tribe Makes Myriad Deals To Rent Its Sovereign Immunity

63.    Within a short period of time, the LDF Tribe became one of the most prolific purveyors in the rental market for sovereign immunity, making "rent-a-tribe" agreements with **over 50 different non-tribal investors**, both domestic and international – many of whom have their own history of questionable business practices.

### Quick Help Loans Actually Operated by Integra

64.    Integra is a limited liability company with a single managing member, Nevada Impact. Integra and Nevada Impact are run by Dan Shaw ("**Shaw**"), a Henderson, Nevada City Councilman, and his business partner, Greg Jones ("**Jones**"). The duo own numerous payday loan companies, including Clearline Loans Florida LLC, which is registered with the Florida Secretary of State as an active limited liability company.

65.    According to Shaw's campaign re-election website, www.danshawnv.com, "in July 2011, Mr. Shaw and his business partner Greg Jones formed Integra Financial Services, LLC, for

the purpose of acquiring substantially all of the assets of **Impact Payment Systems, LLC**, an on-line variable payment installment loan lender." *See* http://danshawnv.com/about/, accessed May 8, 2020 (**emphasis added**).

66.      Impact Payment Systems, LLC ("Impact") was sued in March 2011 by the *Securities and Exchange Commission* ("**SEC**"), who claimed Impact was not only a payday lender engaging in usurious lending but was also a Ponzi scheme which raised $47 million from 120 investors to "fund" payday loans.

67.      Impact owned Impact Cash LLC, which was located at **1759 N. 400 East, Suite 201, North Logan, UT 84341,** the same address where Integra is now located.

68.      After their acquisition of Impact, Shaw and Jones sought ways to expand Impact's payday lending business, now renamed Integra, with a second entity, Nevada Impact Management.

69.      However, their expansion became difficult in 2013 when the United States Department of Justice initiated Operation Choke Point. This operation investigated banks who conducted business with usurious online payday lenders, firearms dealers, and other companies believed to be operating outside of the law. As a direct result of Operation Choke Point, banks terminated their payday lender accounts, such as that for Impact-turned-Integra.

70.      In 2014, Green Arrow Solutions and its accompanying website, GreenArrowLoans.com, was created to fill this void.  Supposedly, Green Arrow Solutions is "owned" by the Big Valley Band of Pomo Indians, although archives of Domain Name Registration records show the website is registered to Integra. The Big Valley Band of Pomo Indians is a small, desperately poor Indian tribe in update California. No offices relating to consumer lending are on its reservation; all loan activity occurs at Integra's offices in Utah.

71.     Jones and Shaw have other "rent-a-tribe" agreements as well, including an online lender called Greenline Loans. This online payday lender, which makes loans to consumers at interest rates in excess of 700%, is supposedly owned by the Fort Belknap Indian Community (the "**Fort Belknap Tribe**"), a small, economically depressed, isolated tribe in rural Montana.

72.     However, the website www.greenlineloans.com was registered by *Integra* on January 10, 2012. **SEE PLAINTIFF'S EXHIBIT E.**

73.     Further, the administrative, technical and billing address for www.greenlineloans.com is: Integra Financial Services, LLC, 1759 N 400 E, Suite 202, Logan, UT 84341. *Id.*

74.     The website continues to be registered in Integra's name, as of the date of this filing.

75.     Similar to Green Arrow and Green Line loans, Quick Help Loans is an online payday lender allegedly owned the LDF Tribe through its subsidiary tribal lending entity ("TLE"), Waawaatesi LLC ('Waawaatesi'). Quick Help Loans makes loans to consumers at interest rates exceeding 500% through quickhelploans.com.

76.     Like Green Arrow and Green Line Loans, Quick Help Loans is operated by Shaw and Jones vis-à-vis Integra and Nevada Impact, who pay a small percentage of revenue to the LDF Tribe in exchange for taking ownership of the lending business, on paper.

77.     Calls to Quick Help Loans customer service phone number, 888-995-4815, are answered by Integra in Utah; likewise, virtually all aspects of the lending business are administrated from locations far from the LDF Tribe's lands in Wisconsin.

78.     The web servers for Quick Help Loans are not located on the LDF Tribe's reservation.

79.     Domain Name Registration records from June 14, 2013, show that the website is registered to: Integra Financial Services LLC, 1759 N 400 E, Suite 202, Logan, Utah 84341, email: itbilling@integrafinancialservice.com, phone: 800-886-8146. Integra is the registrant, administrative, and technical contact. No mention of the LDF Tribe is contained anywhere in the Domain Name Registration records. **SEE PLAINTIFF'S EXHIBIT F.**

80.     QuickHelpLoans.com continues to be registered in the name of Integra as of 2020.

### **LDF Holdings/ Waawaatesi Appoints Integra 'Agent' and 'Service Provider'**

81.     To successfully operate Quick Help Loans, Integra and Nevada Impact need access to detailed consumer data kept in the files of a number of CRAs which specialize in servicing the needs of the online payday loan industry, including Clarity Services, Inc. ("**Clarity**"), FactorTrust, Inc. ("**FactorTrust**"), DataX, Ltd. ("**DataX**") and Chex Systems, Inc. ("**Chex Systems**") (jointly, the "Specialty CRAs"). FactorTrust's parent company is Trans Union, DataX's parent company is Equifax, and Clarity's parent company is Experian Information Solutions, Inc. ("**Experian**"). Thus, Integra and Nevada Impact have access to the files of the "Big Three" CRAs, in addition to the considerable additional information contained in the subsidiary CRAs files especially useful to payday lenders.

82.     Without access to the hundreds of datasets contained on each consumer by these CRAs – everything from employment, salary information, IP addresses utilized, credit card balances, checking account overdrafts, real estate values, frequency of changes of addresses, and much more – the detailed, computerized underwriting analytics utilized by Integra and Nevada Impact would be virtually impossible to perform.

83.    The Specialty CRAs require entities like Quick Help Loans to have subscriber accounts before being granted access to obtain consumer reports.  Pursuant to the FCRA, the Specialty CRAs had to make reasonable efforts to verify the identity of new subscribers and ensure their reasons and purposes for needing large amounts of consumer credit reports is legitimate.

84.    The FCRA's "know your customer" requirements create a potential pitfall for the Specialty CRAs, since the majority of reports they sell are to online payday lenders. In recent years, a great number of these online payday lenders have adopted a "rent-a-tribe" model, which means the purported end users of the reports are **not** who they really claim to be, making verification problematic.

85.    This creates a Catch-22 for Specialty CRAs: if they comply with the FCRA and legitimately verify the end users of their reports, then they will have complied with federal law but will have decimated their customer base. If they sell reports to unverified end users, their customer base remains intact, but the Specialty CRAs could be exposed to federal regulatory action and private litigation.

86.    Thus, a work-around was devised: the Specialty CRAs allow "tribal" lenders like Quick Help Loans to appoint agents or "authorized service providers." Ostensibly, the agents/service providers simply obtain reports and then provide them to the "real" end users, the TLEs. The agents/service providers certify to the CRAs they will not use the reports for their own purposes and act only as an agent for the TLE.

87.    When verifying the identity of a supposedly tribally owned payday lender, Clarity performs extensive due diligence on the *agent* but virtually none on the actual TLE. Clarity sends an independent inspector to investigate, document, and photograph the agent's place of business, and to verify that it has security measures in place to protect stored data, that the business is staffed

by a sufficient number of employees relevant to the number of reports the business requests, that it has landline office phones, that it has paper shredders to properly dispose of printed credit reports, and much more.

88.     In contrast, Clarity makes virtually no attempt to verify the identity of the TLE itself, even though, in all cases, the TLE is the purported end user of the reports. Instead, Clarity relies upon its verification of the TLE's agent/authorized service provider. Clarity's review of the end user is limited to reviewing its website online and confirming that the website is functional.

89.     Clarity makes no evaluation of the content of the website or that the website is actually operated by the end user. Indeed, Clarity's investigation of the agent/authorized service provider virtually always establishes that the website is operated by the agent/authorized service provider itself.

90.     The end result of Clarity's charade is a 20-page-long inspection report which appears to extensively document the agent's business. Thus, if Clarity ever faces regulatory or private legal action, Clarity has pre-fabricated plausible deniability, as the "due diligence" inspection reports likely go in to far greater detail than actually required by the FCRA, whose plain language at § 1681e(a) simply requires "reasonable" investigation.

91.     This formula creates a "win/win" scenario for all involved – Clarity can show that it performed extensive due diligence without harming its customer base. The "agents" like Integra – who are almost always the real end users of the reports – can continue to get access to data in Clarity's files which provide the high-octane fuel for their underwriting engines. Should anyone ask, agents like Integra claim they are simply technology consultants who streamline the acquisition of data from the CRAs but do not use it themselves. The TLE's, if pressed, can assert sovereign immunity from liability.

92.     Clarity – and the other Specialty CRAs, who have adopted similar policies-- is fully aware that its due diligence investigations have more to do with creating the *appearance* of compliance with the FCRA than actually facilitating compliance. Clarity willfully turns a blind eye to the obvious fact that the "agents" are really the end users, and the multiple-page documents signed by all parties are essentially pre-written alibis.

93.     Nonetheless, LDF Holdings is a willful and eager participant in this fraud. LDF Holdings is fully aware their appointed agent/service provider, Integra, is obtaining thousands of reports each month from the Specialty CRAs, supposedly for use by LDF Holdings at 597 Peace Pipe Road. LDF Holdings signed agreements with the Specialty CRAs such as Clarity specifically stating that LDF Holdings was the true end user of the reports, that Integra was its agent and under LDF Holdings' control, and that LDF Holdings would warrantee and guarantee that Integra would obtain reports only as deemed permissible by the FCRA.

94.     LDF Holdings knew, when making such certifications to Clarity and the other Specialty CRAs, that despite its promises and representations, Integra would obtain reports for many different reasons, including marketing and pre-screening, and that a large majority of the reports obtained by Integra would lack any permissible purpose under the FCRA.

## Integra Pulls Credit Report Impermissibly

95.     On October 12, 2018, Integra, as agents or service providers for LDF Holdings and Waawaatesi, obtained CBRs on Ms. London from Clarity and Experian. Experian made a record of the inquiry, stating the requesting party was Waawaatesi LLC, 597 Peace Pipe Rd., Lac du Flambeau, WI 54538.

96.     The FCRA, 15 U.S.C. § 1681b(f), requires that any entity requesting a consumer report have a "permissible purpose" for doing so and certify what those reason(s) are,

97.     Integra certified to Clarity and Experian the requests were in connection with an application for credit or other transaction *initiated by* Ms. London. Further, Integra certified to Clarity and Experian that the end user of the report was Waawaatesi, who apparently operates from a smoke shop in rural Wisconsin.

98.     Such certifications were false. Integra was aware Ms. London made no application for credit to Quick Help Loans, and Integra knew that it, and not "Waawaatesi LLC," would be the end user of the report.

99.     Assuming, *arguendo*, that Defendants had a permissible purpose to obtain a CBR from Clarity regarding Ms. London, it was still required by the FCRA to state the actual, correct purpose and to not use the information obtained from Clarity for any other purpose.

100.     Integra and Nevada Impact obtained Ms. London's basic personal information – name, address, date of birth, employer, and a few other details – from an online "lead generator."

101.     Many of these lead generators use misleading and false statements to hoodwink unsuspecting consumers into providing personal information about themselves, reselling the information to illegally operating payday lenders like Defendants, who then seek to qualify their new "leads" by obtaining highly detailed credit reports containing the consumers' spending and financial behavior from sources like Clarity and Experian.

102.     The ***Consumer Financial Protection Bureau*** ("**CFPB**") has brought complaints against a number of "lead generators" who duped consumers into providing personal information about themselves, and then re-sold these leads to online payday lenders that they knew were operating illegally. *See, e.g., In the Matter of Zero Parallel,* 2017-CFPB-0017.

103.    Once the leads are purchased from an online lead generator, online payday lenders such as the Defendants use sophisticated predictive algorithms to determine which consumers may be financially distressed but are likely to make loan payments.

104.    Qualified consumers are then bombarded with a flood of advertising emails, text messages, automated sales phone calls, and more, playing up the "quick and easy" loan terms offered, with no mention of the true cost of the loan.

105.    Integra relies on shadowy data brokers/lead generators to obtain the vast majority of their leads, about whom it pulls detailed credit reports, and to whom it markets its services, provided the consumer's data fits the profile developed by Quick Help Loans' non-tribal, *de facto* owners, who supply the capital to make loans and control the underwriting process.

106.    As the loans offered by Integra d/b/a Quick Help Loans are neither legal nor cognizable under Florida law, the Integra could not actually extend a loan to Ms. London.  Its representations to Clarity and Experian regarding the purpose of their inquiries were, therefore, falsehoods.

107.    Conversely, lead generation for marketing purposes is not a permissible purpose to obtain a credit report under the FCRA.

108.    Integra did not state its permissible purpose was for "promotional" purposes to solicit Ms. London with a firm offer of credit; the FCRA restricts information that a CRA can provide when certification is made for this purpose.

109.    Rather, Integra certified to Clarity and Experian that it had a permissible purpose to obtain Ms. London's *full* consumer credit history and obtained such history on the false basis she had *already applied* to Quick Help Loans for a loan.

110.    Thus, Integra and Nevada Impact, the controlled agents for LDF Holdings and Waawaatesi – the purported end users of the CBRs – had no permissible purpose for obtaining the reports. However, Integra and Nevada Impact were acting under the authority and direction of LDF Holdings, who is thereby jointly and severally liable for violations of the FCRA.

111.    As previously indicated, Integra and Nevada Impact are under common control and are operated and managed by the same individuals – Shaw and Jones.

112.    The sole managing member of Integra is Nevada Impact.

113.    On information and belief, the entities commingle funds and share common employees, common officers, common ownership, and strategic leadership such that they constitute a single business enterprise.

114.    As such, both Integra and Nevada Impact are jointly and severally liable for the above-stated conduct.


### Sky Trail Cash Owned by William C. Pruett/STS

115.    Sky Trail Cash is an online payday lender that offers loans at exorbitant interest rates, sometimes exceeding 800%. **SEE PLAINTIFF'S EXHIBIT G.**

116.    According to its website, skytrailcash.com, "Ningodwaaswi, LLC d/b/a Sky Trail Cash and skytrailcash.com are Native American owned businesses organized under the laws of the Lac du Flambeau Band of Lake Superior Chippewa Indians." *Id.* Ningodwaaswi, LLC is a TLE owned by LDF Holdings.

117.    Despite such claims, the true beneficial owner of Sky Trail Cash is William C. "Cheney" Pruett ("**Pruett**"), a long-time Texas payday loan titan, who has owned and operated many storefront payday lenders and similar businesses. Public records show dozens of companies registered with the Texas Secretary of State in Pruett's name, including Gladewater Cash Now LLC, Texarkana EZ Cash Advance Inc., Sulphur Springs Cash Express LLC, and others.

118.    Texas law limits the fees that licensed payday lenders can charge to an initial $10 fee plus $4 per $100 borrowed per month. Thus, a lawful Texas lender could charge a maximum of $130 in interest and fees for a $500 loan, repaid over a 6-month period.

119.    Sky Trail Cash's website, skytrailcash.com, shows an identical loan charging $1,375.96, with $875.96 in interest – an annual interest rate of 520%. *Id.*

120.    Archived records from the Domain Name Registration database show that the internet domain - skytrailcash.com - was registered on June 19, 2012, to My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501. **SEE PLAINTIFF'S EXHIBIT H.**

121.    The administrative and technical contact for the domain was John Humphrey ("**Humphrey**"), jhumphrey@dmpinvestments.net, My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501, phone (903) 794-0013. *Id.*

122.    Humphrey is the Chief Financial Officer of DMP Investments, LLC, another company owned by Pruett.

123.    The address 1614 Hampton Rd., Texarkana, TX is a commercial building with the name "Roundstone" prominently displayed on the exterior. **SEE PLAINTIFF'S EXHIBIT E.**

124.    Records from the Texas Secretary of State show that Roundstone Professional Services Group, LLC ("**Roundstone**"), previously listed 1614 Hampton Rd., Texarkana, TX as its primary address. Pruett is the managing member of Roundstone, and Roundstone currently lists

5904 Summerfield Dr., Texarkana, TX as its primary address, similarly to Pruett's other businesses.

125. SkyTrailCash.com continues to be registered to entities owned by Pruett as of 2020.

126. Pruett has other "rent-a-tribe" schemes operating simultaneously. Pruett is the owner of RBC Servicing, LLC, which operates the payday lending website RiverbendCash.com. The website makes loans at interest rates at over 700% interest, and is supposedly owned by the Fort Belknap Tribe in Montana. However, domain registration records show RiverBendCash.com was, just like SkyTrailCash.com, registered to Pruett's My Cash Center. Tradeline data reported to FactorTrust about the Riverbend Cash loans uses RBC's real address, and even indicates the name of the lender is "RBC Servicing, LLC, 1614 Hampton Road, Texarkana, TX 75503."

127. Similar to Integra and Quick Help Loans, LDF Holdings appointed STS its agent/service provider for the TLE Ningodwaaswi.

128. On July 31, 2018, STS, as agents or service providers for LDF Holdings and Ningodwaaswi, obtained CBRs on Ms. London from Clarity and Experian. Experian made a record of the inquiry, stating the requesting party was Ningodwaaswi, LLC, 597 Peace Pipe Rd., Lac du Flambeau, WI 54538. Ms. London learned of the inquiry upon review of her March 26, 2020 Experian consumer disclosure.

129. STS certified to Clarity and Experian the requests were in connection with an application for credit or other transaction *initiated by* Ms. London. STS certified to Clarity and Experian that the end user of the report was Ningodwaaswi, which operates from the same smoke shop in rural Wisconsin as Quick Help Loans

130. Such certifications were false. STS was aware Ms. London made no application for credit to Sky Trail Cash, and STS knew that it, and not "Ningodwaaswi, LLC," would be the end

user of the report. STS obtained Ms. London's information from one or more online lead generators, and obtained the reports to obtain more data about Ms. London than provided by the lead generator, in an attempt to pre-qualify her for a loan.

131.    Thus, STS, the controlled agent for LDF Holdings and Ningodwaaswi – the purported end users of the CBRs – had no permissible purpose for obtaining the reports. However, STS was acting under the authority and direction of LDF Holdings, who is thereby jointly and severally liable for violations of the FCRA.

**Mint Servicing/Ubicash Obtains Reports Without Permissible Purpose**

132.    Perhaps unique among the 50+ payday lending websites operated by LDF Holdings, Ubicash, a payday lender making loans at wildly usurious interest rates, began its digital existence as a Mandarin-language gambling site that also featured scantily clad women and other prurient content.

133.    In early 2016, ubicash.com moved to the United States and was re-born as an online payday lending website, offering consumer loans at interest rates of 659% annually and higher. As of 2016, it claimed to be owned by Nigig, LLC, d/b/a UbiCash, which, in turn, claimed to be owned by the LDF Tribe via LDF Holdings.

134.    Despite claims of ownership by LDF Holdings, domain registration records from August 10, 2016, show it was registered to Liang Zhao ("Zhao"), 13034 Jicama Ter., San Diego, CA 92130, phone (804) 274-8757. **SEE PLAINTIFF'S EXHIBIT I.**

135.    Zhao was also involved in a financial technology (often called "fintech") start-up called Mint Quantum, which was based in Guangdong, China. Domain Registration Records show its website, MintQ.cn, was registered to "北京明特量化信息技术有限公司" which in English is "Beijing

Mingte Quantitative Information Technology Co., Ltd" ("Beijing Mingte"). **SEE PLAINTIFF'S EXHIBIT J.**

136.    Mint Quantum's website in 2017 through 2019 displayed its three primary loan products: a Mandarin-language smartphone app which enables consumer borrowers in China to receive loans up to 5,000 yuan (about $725). It also made loans to small businesses though its subsidiary called "Xiangquandai," also known as Mingte Commercial Factoring, Ltd. This portion of Mint Quantum's website was almost all in Mandarin.

137.    Prominently featured at the bottom of Mint Quantum's webpage was, in English, UbiCash's name and its distinctive logo of a "U" in a blue circle, along with screen shots showing graphics identical to those currently utilized by the "tribally" owned ubicash.com. **SEE PLAINTIFF'S EXHIBIT K.**

138.    The website of Mint Quantum also featured the taglines "Loans You Understand" and "Loans That Grow With You." *Id.* The identical language is found, currently, on the "tribally" owned ubicash.com.  **SEE PLAINTIFF'S EXHIBIT L.**

139.    Mint Quantum's website indicated it had an office in Virginia. At some point, Mint Quantum appears to have discontinued operations in the United States; however, Mint Servicing, Inc., Mint Quantum's American counterpart, has continued operations.

140.    The personal email address of Liang Zhao, leon79@gmail.com, appears in May 22, 2017 domain name registration records of Ubicash.com. Zhao often uses the names "Leo" and "Leon" in America. The same email address, leon79@gmail.com, appears on domain registration records of MintQ.cn.  **SEE PLAINTIFF'S EXHIBITS M and N.**

141.    Another online payday lender supposedly owned by Nigig LLC, and thus, in turn, LDF Holdings, is called DashCash, and operates from www.dashcash.com. Like Ubicash, it makes

loans at rates of 650% and higher. Domain registration records from August 2, 2017 are partially redacted, but show a registered address of 3130 Borge St., Oakton, VA 22124. The address is a townhome owned by Yi Liu, a relative of Huan Li.

142.    Liang Zhao is the CEO of Mint Servicing, Inc. Its president is Huan Li.

143.    LDF Holdings appointed Mint Servicing to be its agent/service provider and certified to Clarity, Experian, and many other CRAs that Mint Serving was its agent and under its control. At all points in time, all parties were aware Mint Servicing was, and is, the real lender, servicer, collector and administrator of Ubicash loans, as well as the end user of credit reports obtained "on behalf of" LDF Holdings.

144.    On July 27, 2018, Mint Servicing obtained CBRs regarding Ms. London from Clarity and Experian, who logged a record of the inquiry. **SEE PLAINTIFF'S EXHIBIT O.** Ms. London learned of the inquiry upon review of her March 26, 2020 Experian consumer disclosure.

145.    Mint purchased Ms. London's basic personal information from an online lead generator, in a similar fashion to Quick Help Loans and Sky Trail Cash. At no point did Ms. London apply for any loan with Ubicash or Mint Servicing.

146.    Mint certified to Clarity and Experian that the reports were needed to evaluate Ms. London for a loan she had *already applied for*, and that end user of the report was Nigig, who, like the other LDF Holdings TLEs, apparently operates from a smoke shop in rural Wisconsin. Such certifications were false, and Mint knew that it, and not "Nigig LLC," would be the end user of the report and that the purpose of the request was to obtain more information on Ms. London for loan pre-qualification purposes.

147.    Mint, the controlled agent for LDF Holdings and Nigig – the purported end users of the CBRs – had no permissible purpose for obtaining the reports. However, Mint was acting

under the authority and direction of LDF Holdings, who is thereby jointly and severally liable for violations of the FCRA.

## **Loan At Last Owned by Creditserve**

148.    LDF Holdings claims to own Niizhwaaswi, LLC, which does business as Loan At Last and operates the payday loan website loanatlast.com. It, too, claims to operate from 597 Peace Pipe Road on the second floor of a cigarette store. It makes loans to consumers at interest rates eclipsing 700% annually.

149.    Loan at Last is really owned by Eric Welch, a veteran of the payday lending industry. Welsh owns, or owned, many payday lending companies, including Helping Hand Financial, Inc. which did business in Texas as CashCash, Inc. Both lenders have been citied and fined by Texas regulatory authorities on multiple occasions.

150.    Around January 2015, Welch purchased the domain name loanatlast.com from HugeDomains.com, an online broker and re-seller of existing web domain names.

151.    Calling the main (and only) customer service phone number listed on Loan At Last's website, 844-676-8550 in August 2020 resulted in a representative answering the phone in the name of Loan At Last. When asked if the caller had reached Creditserv, the "Loan At Last" representative quickly confirmed, "yes."

152.    Due to certain technical limitations in the automated systems of the Specialty CRAs, Creditserve's name and address sometimes appears in credit inquiries on consumer credit disclosures, sometimes showing as "CREDITSERV/LOANAT LAST" and listing Creditserve's California address, instead of LDF Holdings' Wisconsin address. **SEE PLAINTIFF'S EXHIBIT P.**

153.    LDF Holdings appointed Creditserve to be its agent/service provider and certified to Clarity, Experian, and many other CRAs that Creditserve was its agent and under its control. At all points in time, all parties were aware Creditserve was, and is, the real lender, servicer, collector and administrator of Loan at Last loans, as well as the end user of credit reports obtained "on behalf of" LDF Holdings.

154.    On October 24, 2018, November 26, 2018, January 26, 2019, February 21, 2019, and May 2, 2019, Creditserve obtained CBRs regarding Ms. London from Clarity and Experian, who logged a record of the inquiries. **SEE PLAINTIFF'S EXHIBIT Q.**

155.    In each instance, Creditserve purchased Ms. London's basic personal information from an online lead generator. At no point did Ms. London apply for any loan with Loan at Last or Creditserve.

156.    Creditserve certified to Clarity and Experian that the reports were needed to evaluate Ms. London for a loan she had *already applied for*, and that end user of the report was Niizhwaaswi, LLC, who, like the other LDF Holdings TLEs, operates from an increasingly-packed smoke shop in rural Wisconsin. As in other instances, such certifications were false, and Creditserve knew that it, and not "Niizhwaaswi, LLC," would be the end user of the report and that the purpose of the request was to obtain more information on Ms. London for loan pre-qualification purposes.

157.    Creditserve, the controlled agent for LDF Holdings and Niizhwaaswi – the purported end users of the CBRs – had no permissible purpose for obtaining the reports. However, Creditserve was acting under the authority and direction of LDF Holdings, who is thereby jointly and severally liable for violations of the FCRA.

**Radiant Cash Operated by Fintech Startup MoneyLion**

158.    LDF Holdings claims to own Ishwaaswi, LLC, which does business as Radiant Cash and operates the payday loan website radiantcash.com. Radiant Cash makes loans to consumers at interest rates exceeding 700% annually. Despite LDF Holdings' claim of ownership, MoneyLion is the real owner and operator of Radiant Cash.

159.    Domain Name Registration records show that on November 11, 2013, radiantcash.com was registered to **MoneyLion LLC**, 11 Patricia Way, Kendall Park, NJ 08824, phone (917) 971-6064, email dc@moneylion.com. **SEE PLAINTIFF'S EXHIBIT R.**

160.    The "dc" in the email address is short for Diwakar Choubey, the CEO of MoneyLion.

161.    The address 11 Patricia Way, Kendall Park, NJ 08824 is Choubey's previous home address. The phone number (917) 971-6064 also belonged to him.

162.    Archives of MoneyLion's now-discontinued website, LionLoans (www.lionloans.com), show that when LionLoans was still active, it contained a contact address in the small town of Isabel, South Dakota. **SEE PLAINTIFF'S EXHIBIT S.**

163.    A listing with the Better Business Bureau for MoneyLion also indicates an address in South Dakota.

164.    In 2014, a call center employing over 20 phone agents opened in Isabel, South Dakota, called Dakota Service Center; the CEO was Laib. **SEE PLAINTIFF'S EXHIBIT T.**

165.    Laib's online resume on LinkedIn states that she was the "Director of Operations-Radiant Cash" at the Dakota Service Center in Isabel, South Dakota, between April 2014 and September 2016; simultaneous to this, she states she held the position of Managing Director of Salt Lake City Operations at MoneyLion in Salt Lake City, Utah. The online resume of Samantha

Goldade indicates that she worked for MoneyLion between July 2014 and February 2018: first as a manager at its Dakota Service Center until July 2015, and then as a manager at MoneyLion.

166.    Thus, the Dakota Service Center was funded and managed by MoneyLion.

167.    MoneyLion maintains offices in Kuala Lumpur, Malaysia, and New York City.

168.    The online resume of Christopher Loganathan, Software Architect, Selangor, Malaysia, indicates he worked on the Radiant Cash website while employed by MoneyLion as a Senior Software Engineer Team lead. **PLAINTIFF'S EXHIBIT U.**

169.    While at MoneyLion, Loganathan helped develop a "website which manages USA customers loan application via these websites… the first part which is the type of loans offered to customers. The loan products are called as RadiantCash and LionLoans." *Id.*

170.    Thinegan Ratnam is the Director of IT Infrastructure and Security at MoneyLion in Kuala Lumpur, Malaysia, and he also worked on RadiantCash.com while employed with Money Lion. **SEE PLAINTIFF'S EXIBIT V.**

171.    On his blog, Ratnam states "Moneylion Inc, a short term loans provider. The company managed to release Moneylion.com, Lionloans.com, **Radiantcash.com**." *Id.*

172.    LDF Holdings appointed MoneyLion, either directly or via its subsidiary, QuantiLion, to be its agent/service provider and certified to Clarity, Experian, Chex Systems, and many other CRAs that MoneyLion was its agent and under its control. At all points in time, all parties were aware MoneyLion was, and is, the real lender, servicer, collector and administrator of Radiant Cash loans, as well as the end user of credit reports obtained "on behalf of" LDF Holdings.

173.    Indeed, QuanitLion Data Strategies, MoneyLion's subsidiary, name sometimes appears as the *only* name on consumer credit inquiries made to Chex Systems, although Chex Systems discloses LDF Holdings Wisconsin address. **SEE PLAINTIFF'S EXHIBIT W.**

174. On November 26, 2018, MoneyLion obtained a CBR regarding Ms. London from Chex Systems, who logged a record of the inquiry. **SEE PLAINTIFF'S EXHIBIT X.**

175. MoneyLion purchased Ms. London's basic personal information from an online lead generator. At no point did Ms. London apply for any loan with Radiant Cash or MoneyLion.

176. MoneyLion certified to Chex Systems the report was needed to evaluate Ms. London for a loan she had *already applied for*, and that end user of the report was Ishwaaswi, LLC, who, in a now-common refrain, operates from a smoke shop in Wisconsin. As in each previous example, such certifications were false, and MoneyLion knew that it, and not "Ishwaaswi, LLC" would be the end user of the report and that the purpose of the request was to obtain more information on Ms. London for loan pre-qualification purposes.

177. MoneyLion, the controlled agent for LDF Holdings and Ishwaaswi – the purported end users of the CBRs – had no permissible purpose for obtaining the reports. However, MoneyLion was acting under the authority and direction of LDF Holdings, who is thereby jointly and severally liable for violations of the FCRA.

<u>**Chex Systems Fails To Verify Identity of 'Radiant Cash'**</u>

178. Chex Systems' consumer reports typically include phone numbers, detailed address history, employment information, checking account opening and closing data, and other highly personal, confidential, and sensitive information.

179. Prior to providing reports to "Radiant Cash," Chex Systems, as a CRA, was required by the FCRA to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." *See* 15 U.S.C. § 1681e(a).

180.    The FCRA does not define the phrases "reasonable efforts" or "reasonable procedures," but the FTC interprets them to require an agency "to verify that [each user] is . . . **a legitimate business** having a 'permissible purpose' for the information reported." *Aleksic v. Clarity Servs., Inc.*, Case No: 1:13-cv-07802 (N.D. Ill. Jul. 8, 2015), quoting *Commentary on the Fair Credit Reporting Act*, § 607(b)(2)(A), 55 Fed. Reg. 18,804-01 at 18,819 (May 4, 1990). (**Emphasis added.**)

181.    Beyond this, the FCRA imposes a duty of reasonable care on a CRA. *See Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

182.    Further, "[n]o consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in § 1681b of this title." 15 U.S.C. § 1681e(a).

183.    Chex Systems method of verifying TLE's is substantially similar to Clarity's. It investigates the agent/service provider, but makes virtually no attempt to verify the identity of the purported end users of the reports, the TLEs themselves.

184.    Chex Systems goes out of its way not to verify the identity of the TLE, since Chex Systems is well aware the TLEs are sham, straw facades for the agent/service provider. Chex Systems made no investigation into Ishwaaswi, LLC itself, since any independent investigator, arriving at the LDF Smoke Shop in rural Wisconsin, would quickly realize that cartons of untaxed Marlborough's have nothing to do with online payday lending.

185.    Instead, Chex Systems investigated MoneyLion and/or QuantiLion Data Strategies offices, employees, and equipment. Chex Systems' investigator was able to quickly verify MoneyLion and/or QuantiLion Data Strategies met the qualification criteria to obtain a subscriber

account from Chex Systems, having a substantial physical presence, large number of employees devoted to consumer lending, etc.

186.    Chex Systems then relied on the signed agreements between MoneyLion and LDF Holdings stipulating that LDF/ Ishwaaswi was the "end user" of the reports, despite an abundance of evidence to the contrary. Worse, Chex Systems method of verification of TLEs like Ishwaaswi was designed precisely to provide positive inspection reports so Chex Systems could sell reports by the truckload to like MoneyLion/ QuantiLion while still creating the outward *appearance* of compliance with the FCRA.

187.    As a result, Chex Systems failed to make a reasonable effort to verify the identities of LDF/ Ishwaaswi as required by the FCRA, 15 U.S.C. § 1681e(a).

188.    Likewise, Chex Systems had no reasonable basis to believe the report it sold to "Radiant Cash" on November 26, 2018 would be used only for the purposes certified to Chex Systems and that Ishwaaswi was the "end user" of the report. To the contrary, Chex Systems had every reason to believe MoneyLion/QuantiLion was really the end user of the report, despite certifications to the contrary.

189.    On December 27, 2018, Chex Systems sold a report regarding Ms. London to "Zocaloans," an online payday lender supposedly located in Mission, South Dakota, which purports to be owned by the Rosebud Sioux Tribe. The TLE is called Rosebud Lending LZO.

190.    Chex Systems sold the report to the agent/service provider Tactical Marketing Partners, LLC ("Tactical"), which is a wholly-owned subsidiary of the Miami, Florida based hedge fund 777 Partners, LLC ("777").

191.    Almost identically to its verification of Radiant Cash, Chex Systems simply sent its investigators to Tactical/777's gleaming downtown Miami office, located in one of the city's most

expensive downtown skyscrapers. Chex Systems investigator was able to respond with a positive inspection report; had Chex Systems' investigator arrived in rural South Dakota to the address the Rosebud Sioux Tribe claim to run their business from, the investigator's report would likely have been dismal, since no offices or employees devoted to consumer lending are stationed on the Rosebud Sioux's reservation.

192.    As a result, Chex Systems failed to make a reasonable effort to verify the identities of Zocaloans/Rosebud Lending LZO as required by the FCRA, 15 U.S.C. § 1681e(a).

193.    Likewise, Chex Systems had no reasonable basis to believe the report it sold to "Zocaloans" on December 27, 2018 would be used only for the purposes certified to Chex Systems and that Rosebud Lending LZO was the "end user" of the report. To the contrary, Chex Systems had every reason to believe Tactical/777 was really the end user of the report, despite certifications to the contrary.

**Chex Systems Sold Report to FactorTrust without Permissible Purpose**

194.    In addition to selling reports to questionable TLEs, Chex Systems also sells, wholesale, reports about consumers to other CRAs like FactorTrust. FactorTrust then incorporates Chex Systems' proprietary databases regarding consumer's checking account openings, closings and charge-offs into reports it sells to other creditors.

195.    Chex Systems sold detailed information regarding Ms. London to FactorTrust on February 4, 2019.

196.    The data included Ms. London's current and previous addresses, hundreds of data points about her checking account history, a number of payday loan inquiries, and driver's license information.

197.    Chex Systems had no reasonable basis to believe that FactorTrust intended to use the information about Ms. London in connection with any credit transaction regarding FactorTrust, since FactorTrust is a CRA and not a consumer lender, insurance underwriter, or any type of entity which would normally have a permissible purpose.

198.    Chex Systems had no reason to believe any permissible purpose existed for FactorTrust to obtain Ms. London's CBR, since nothing in the FCRA inherently allows one CRA to provide reports to another CRA, absent permissible purpose accorded to that CRA.

199.    Ms. London has hired the aforementioned law firm to represent her in this matter has assigned her right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCRA—Integra/LDF Holdings

200.    Ms. London incorporates paragraphs 1 – 199 as if fully stated herein.

201.    Integra violated **15 U.S.C. § 1681b(f)** when it knowingly obtained CBRs from Clarity and Experian without permissible purpose, falsely certifying to Clarity and Experian the CBRs were needed in connection with a loan application initiated by Ms. London, when the CBRs were really for marketing and pre-screening purposes.

202.    Integra violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian for purposes other than those certified to Experian and Clarity, to wit, marketing and pre-screening purposes.

203.    Integra violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian under false pretenses, certifying to Clarity and Experian that Waawaatesi was the end user of the reports, even though Integra and its non-tribal agents and contractors were the real end user.

204.    Nigig and LDF Holdings violated **15 U.S.C. § 1681b(f)** when they knowingly authorized, condoned, facilitated and participated in Integra obtaining CBRs from Clarity and Experian without any permissible purpose. Integra, as agents for Waawaatesi and LDF Holdings and acting under the authority of Nigig and LDF Holdings and within the scope of its agency, certified to Experian and Clarity that the requests were in connection with an alleged *credit transaction* between Ms. London and Quick Help Loans, when Ms. London had no business or loan with Quick Help Loans.

205.    Assuming, *arguendo,* that Ms. London had applied for a loan with Quick Help Loans, such loan would have been *void ab initio* due to Florida's usury laws, and Nigig and LDF Holdings still would not have permissible purpose to obtain CBRs.

206.    Assuming, *arguendo,* that Ms. London had applied for a loan with Quick Help Loans, Waawaatesi and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. London but rather for pre-screening or marketing purposes to ascertain if Ms. London would be a good "lead" to whom to market its usurious loans.

207.    LDF Holdings is thus jointly and severally liable for the above-stated violations, as they are liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Waawaatesi and LDF Holdings.

208.    As a result of their conduct, Integra and LDF Holdings are liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. London respectfully requests this Honorable Court to enter judgment against Integra and LDF Holdings, jointly and severally, for:

a.   The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.   Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FCRA—STS/LDF Holdings

209.   Ms. London incorporates paragraphs 1 – 196 as if fully stated herein.

210.   STS violated **15 U.S.C. § 1681b(f)** when it knowingly obtained CBRs from Clarity and Experian without permissible purpose, falsely certifying to Clarity and Experian the CBRs were needed in connection with a loan application initiated by Ms. London, when the CBRs were really for marketing and pre-screening purposes.

211.   STS violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian for purposes other than those certified to Experian and Clarity, to wit, marketing and pre-screening purposes.

212.   STS violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian under false pretenses, certifying to Clarity and Experian that Ningodwaaswi was the end

user of the reports, even though STS and its non-tribal agents and contractors were the real end user.

213.     LDF Holdings violated **15 U.S.C. § 1681b(f)** when it knowingly authorized, condoned, facilitated and participated in STS obtaining CBRs from Clarity and Experian without any permissible purpose. STS, as agents for Ningodwaaswi and LDF Holdings and acting under the authority of Ningodwaaswi and LDF Holdings and within the scope of its agency, certified to Experian and Clarity that the requests were in connection with an alleged *credit transaction* between Ms. London and Sky Trail Cash, when Ms. London had no business or loan with Sky Trail Cash.

214.     Assuming, *arguendo,* that Ms. London had applied for a loan with Sky Trail Cash, such loan would have been *void ab initio* due to Florida's usury laws, and Ningodwaaswi and LDF Holdings still would not have permissible purpose to obtain CBRs.

215.     Assuming, *arguendo,* that Ms. London had applied for a loan with Quick Help Loans, Ningodwaaswi and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. London but rather for pre-screening or marketing purposes to ascertain if Ms. London would be a good "lead" to whom to market its usurious loans.

216.     LDF Holdings is thus jointly and severally liable for the above-stated violations, as they are liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Ningodwaaswi and LDF Holdings.

217.    As a result of their conduct, STS and LDF Holdings are liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. London respectfully requests this Honorable Court to enter judgment against STS and LDF Holdings, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF THE FCRA—Mint/LDF Holdings

218.    Ms. London incorporates paragraphs 1 – 196 as if fully stated herein.

219.    Mint violated **15 U.S.C. § 1681b(f)** when it knowingly obtained CBRs from Clarity and Experian without permissible purpose, falsely certifying to Clarity and Experian the CBRs were needed in connection with a loan application initiated by Ms. London, when the CBRs were really for marketing and pre-screening purposes.

220.    Mint violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian for purposes other than those certified to Experian and Clarity, to wit, marketing and pre-screening purposes.

221.    Mint violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian under false pretenses, certifying to Clarity and Experian that Nigig was the end user of the reports, even though Mint and its non-tribal agents and contractors were the real end user.

222.    LDF Holdings violated **15 U.S.C. § 1681b(f)** when it knowingly authorized, condoned, facilitated and participated in Mint obtaining CBRs from Clarity and Experian without any permissible purpose. Mint, as agents for Nigig and LDF Holdings and acting under the authority of Nigig and LDF Holdings and within the scope of its agency, certified to Experian and Clarity that the requests were in connection with an alleged *credit transaction* between Ms. London and Ubicash, when Ms. London had no business or loan with Ubicash.

223.    Assuming, *arguendo,* that Ms. London had applied for a loan with Ubicash such loan would have been *void ab initio* due to Florida's usury laws, and Nigig and LDF Holdings still would not have permissible purpose to obtain CBRs.

224.    Assuming, *arguendo,* that Ms. London had applied for a loan with Ubicash, Nigig and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. London but rather for pre-screening or marketing purposes to ascertain if Ms. London would be a good "lead" to whom to market its usurious loans.

225.    LDF Holdings is thus jointly and severally liable for the above-stated violations, as they are liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Nigig and LDF Holdings.

226.    As a result of their conduct, Mint and LDF Holdings are liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. London respectfully requests this Honorable Court to enter judgment against Mint and LDF Holdings, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FCRA—Creditserve/LDF Holdings

227.    Ms. London incorporates paragraphs 1 – 196 as if fully stated herein.

228.    Creditserve violated **15 U.S.C. § 1681b(f)** when it knowingly obtained CBRs from Clarity and Experian without permissible purpose on four different occasions (e.g., for a total of right reports), falsely certifying to Clarity and Experian the CBRs were needed in connection with a loan application initiated by Ms. London, when the CBRs were really for marketing and pre-screening purposes.

229.    Creditserve violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian for purposes other than those certified to Experian and Clarity, to wit, marketing and pre-screening purposes.

230.    Creditserve violated **15 U.S.C. § 1681b(f)** when it knowingly used CBRs from Clarity and Experian under false pretenses, certifying to Clarity and Experian that Niizhwaaswi was the end user of the reports, even though Creditserve and its non-tribal agents and contractors were the real end user.

231.    LDF Holdings violated **15 U.S.C. § 1681b(f)** when it knowingly authorized, condoned, facilitated and participated in Creditserve obtaining CBRs from Clarity and Experian without any permissible purpose. Creditserve, as agents for Niizhwaaswi and LDF Holdings and acting under the authority of Niizhwaaswi and LDF Holdings and within the scope of its agency, certified to Experian and Clarity that the requests were in connection with an alleged *credit transaction* between Ms. London and Loan at Last, when Ms. London had no business or loan with Loan at Last.

232.    Assuming, *arguendo,* that Ms. London had applied for a loan with Loan at Last such loan would have been *void ab initio* due to Florida's usury laws, and Niizhwaaswi and LDF Holdings still would not have permissible purpose to obtain CBRs.

233.    Assuming, *arguendo,* that Ms. London had applied for a loan with Loan at Last, Niizhwaaswi and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. London but rather for pre-screening or marketing purposes to ascertain if Ms. London would be a good "lead" to whom to market its usurious loans.

234.    LDF Holdings is thus jointly and severally liable for the above-stated violations, as they are liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Niizhwaaswi and LDF Holdings.

235.    As a result of their conduct, Creditserve and LDF Holdings are liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. London respectfully requests this Honorable Court to enter judgment against Creditserve and LDF Holdings, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$8,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

### COUNT V
### VIOLATIONS OF THE FCRA—MoneyLion/LDF Holdings

236.    Ms. London incorporates paragraphs 1 – 196 as if fully stated herein.

237.    MoneyLion violated **15 U.S.C. § 1681b(f)** when it knowingly obtained a CBR from Chex Systems without permissible purpose, falsely certifying to Chex Systems the CBR was needed in connection with a loan application initiated by Ms. London, when the CBR was really for marketing and pre-screening purposes.

238.    MoneyLion violated **15 U.S.C. § 1681b(f)** when it knowingly used a CBR from Chex Systems for purposes other than those certified to Chex Systems, to wit, marketing and pre-screening purposes.

239.    MoneyLion violated **15 U.S.C. § 1681b(f)** when it knowingly used a CBR from Chex Systems under false pretenses, certifying to Chex Systems that Ishwaaswi was the end user of the report, even though MoneyLion and its non-tribal agents and contractors were the real end user.

240.    LDF Holdings violated **15 U.S.C. § 1681b(f)** when it knowingly authorized, condoned, facilitated and participated in MoneyLion obtaining a CBR from Chex Systems without any permissible purpose. MoneyLion, as agents for Ishwaaswi and LDF Holdings and acting under the authority of Ishwaaswi and LDF Holdings and within the scope of its agency, certified to Chex Systems the request was in connection with an alleged *credit transaction* between Ms. London and Radiant Cash, when Ms. London had no business or loan with Radiant Cash.

241.    Assuming, *arguendo,* that Ms. London had applied for a loan with Radiant Cash such loan would have been *void ab initio* due to Florida's usury laws, and Ishwaaswi and LDF Holdings still would not have permissible purpose to obtain a CBR.

242.    Assuming, *arguendo,* that Ms. London had applied for a loan with Radiant Cash, Ishwaaswi and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. London but rather for pre-screening or marketing purposes to ascertain if Ms. London would be a good "lead" to whom to market its usurious loans.

243.   LDF Holdings is thus jointly and severally liable for the above-stated violations, as they are liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Ishwaaswi and LDF Holdings.

244.   As a result of their conduct, MoneyLion and LDF Holdings are liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. London respectfully requests this Honorable Court to enter judgment against MoneyLion and LDF Holdings, jointly and severally, for:

a.   The greater of statutory damages of **$1,000.00** per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.   Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.   Such other relief that this Court deems just and proper

## COUNT VI
## VIOLATIONS OF THE FCRA – *Chex Systems*

245.   Ms. London incorporates Paragraphs 1 – 196 as if fully restated herein.

246.   Chex Systems violated **15 U.S.C. § 1681b(a)** when it provided reports to "Radiant Cash," (in reality, MoneyLion) and "Zocaloans" (in reality, Tactical/777) while having no reason to believe that these entities had a legitimate business need for the reports or intended to use the

reports in connection with any review of account related to Ms. London, or that the request was in response to a credit transaction initiated by Ms. London.

247.    Chex Systems violated **15 U.S.C. § 1681b(a)** when it provided reports to FactorTrust while having no reason to believe that FactorTrust had a legitimate business need for the report or intended to use it in connection with any review of account related to Ms. London, or to make any firm offer of credit or insurance; and no objective, reasonable basis exists to conclude that another CRA would only use the report provided by Chex Systems for the purposes certified and no other.

248.    Chex Systems violated **15 U.S.C. §1681e(a)** when it failed to make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report by accepting, without challenge or independent verification, the identities of "Radiant Cash" and "Zocaloans." Radiant Cash, the purported end user of the reports, claimed to operate from a small smoke shop in Wisconsin with no lending offices or employees devoted to lending. Zocaloans claimed to operate from a small office in rural South Dakota, which contains no employees devoted to consumer lending. Chex Systems helped engineer a verification system where non-tribal proxies were vetted as purported agents, intentionally overlooking the fact that these agents had great incentive to lie and virtually no incentive to tell the truth. No *reasonable* verification of the identity of Radiant Cash or Zocaloans could have occurred by Chex Systems, and any reasonable verification would have quickly revealed that the proclaimed tribal owners of Radiant Cash and Zocaloans were not the real end users of the reports.

249.   Ms. London has suffered damages in that her personal, highly confidential information, such as her employment history, credit history, address, and Social Security number, have been obtained by a party who had no legitimate purpose for obtaining it.

250.   Chex Systems' conduct was willful and intentional, or alternately, was done with a reckless disregard for its duties under the FCRA.

251.   As a result of its conduct, Chex Systems is liable to Ms. London pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Clark respectfully requests this Honorable Court enter judgment against Chex Systems for:

a.   The greater of statutory damages of **$1,000.00** per incident (for a total of **$3,000.00**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. London's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. §1681o(a)(1);

b.   Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.   Such other relief that this Court deems just and proper

## DEMAND FOR JURY TRIAL

Ms. London hereby demands a jury trial on all issues so triable.

Respectfully submitted on October 13, 2020, by,

**SERAPH LEGAL, P. A.**
/s/ *Bridget L. Dow*
Bridget L. Dow

Florida Bar No.: 1022866
BDow@seraphlegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
FBN: 118103
TBonan@SeraphLegal.com
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Attorneys for Plaintiff*

**ATTACHED EXHIBIT LIST**

A        Plaintiff's Experian Consumer Disclosure, March 26, 2020, Inquiries Excerpt
B        Server Location for Green Arrow Loans
C        Image of 2770 Mission Rancheria Road, Lakeport, CA
D        Image of 597 Peace Pipe Road, Lac du Flambeau, WI
E        Domain Name Registration Records for Quick Help Loans, Record Date: June 14, 2013
F        Domain Name Registration Records for Greenline Loans, Record Date: January 10, 2012
G        Rates and Terms for Green Arrow Loans